UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JEFFREY MARTIN SCHULMAN,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>WYNN LAS VEGAS, LLC et al.,<br><br>　　　　Defendants. | 2:12-cv-01494-RCJ-GWF<br><br>**ORDER** |

This case arises out of alleged employment discrimination on the basis of Plaintiff's diabetes. Pending before the Court is a Motion for Summary Judgment (ECF No. 60). For the reasons given herein, the Court grants the motion.

**I.      FACTS AND PROCEDURAL HISTORY**

Plaintiff Jeffrey Schulman was an employee at Wynn Las Vegas Hotel and Casino ("Wynn"). (First Am. Compl. ¶ 2, ECF No. 51). Plaintiff has type I diabetes, and he disclosed his condition to Wynn when Wynn hired him as a night shift security officer on or about November 14, 2008. (*Id.* ¶¶10–12). Plaintiff's diabetes requires him to take occasional breaks to check his blood sugar, eat, or otherwise manage his diabetes, and he applied for a day shift position because of difficulties managing his diabetes during the night shift. (*Id.* ¶¶ 13–14). There was a wait-list for the more popular day shift positions, and Wynn placed Plaintiff on the

list. (*Id.* ¶ 15). On August 17, 2009, Plaintiff's doctor, Dr. Wong, wrote him a note recommending a day shift due to his diabetes, and on an unspecified date Plaintiff provided the note to manager Jeff Jackson, who relayed the information to Assistant Director of Security Tony Wilmont, but Plaintiff was not moved to a day shift. (*Id.* ¶¶ 17–20). Plaintiff identifies the transfer to a day shift as the "reasonable accommodation" for his diabetes he requested under the Americans with Disabilities Act ("ADA"). (*See id.* ¶ 20). Although Jackson told Plaintiff he was ninth on the list for transfer to the day shift, and although Employee Relations employee Lucy Vitaro and Executive Director of Security Marty Lethitien told Plaintiff at a December 1, 2009 meeting that he would be transferred to the day shift in January 2010, he was never transferred to the day shift. (*Id.* ¶¶ 21–22).

On November 23, 2009, Wynn disciplined Plaintiff for falling asleep on the job. (*Id.* ¶ 24). Wynn disciplined Plaintiff again for falling asleep on the job on February 14, 2010. (*Id.*). Plaintiff's blood sugar was 439[1] when he awoke on February 14, 2010, but Jackson refused to believe Plaintiff's diabetes had caused him to fall asleep. (*Id.*). At disciplinary meetings, Defendants discounted Plaintiff's condition and refused to transfer him to the day shift. (*Id.* ¶ 25). Eventually, Wynn suspended Plaintiff without pay, pending an investigation. (*Id.* ¶ 28). After a month, Wynn informed Plaintiff that he could not return as a security officer but could apply for other positions. (*Id.* ¶¶ 29–30).

After Plaintiff filed a charge of discrimination, Wynn rehired him as an "assistant shift manager for public areas," which position did not provide as many opportunities for overtime as the position of security officer, although the wages were higher. (*See id.* ¶ 35). The position was also for the night shift, which Wynn did not tell Plaintiff until he accepted the position. (*Id.*

---

1 Normal range is 80–120. (*Id.* ¶ 37).

¶ 36). On an unspecified date approximately three months after beginning the new position, Plaintiff experienced a blood sugar of 38, which led Wynn to suspend him for one week; Plaintiff does not allege the actual cause of the suspension, but presumably he fell asleep again or had to leave his post to manage his diabetes. (*See id.* ¶ 37). Wynn told Schulman he would have to sign a "release" to return to his position, but he refused. (*Id.* ¶ 38). Wynn then provided Plaintiff a position in retail sales, making less money than at either of the two previous positions. (*Id.* ¶ 39).

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). After the EEOC rejected the charge, Plaintiff sued three Wynn entities in this Court on four causes of action under the ADA. Defendants moved to dismiss for failure to file suit within ninety days of receiving the right-to-sue letter. The Court granted the motion, but the Court of Appeals reversed and remanded, ruling that Plaintiff's claim of having received the letter several days after Defendants received a copy of the same letter was sufficient to rebut the three-day mailing presumption, even though the letters were sent from and to the same cities on the same day.

In the Amended Complaint ("AC") that the Court gave Plaintiff leave to file after remand, Plaintiff alleges that in retaliation for filing the Complaint, Defendants disciplined Plaintiff for selling items that had been mismarked by another employee, implementing a policy of disciplining the employee with the lowest sales per hour, failing to counsel Plaintiff on improvements, selectively enforcing policies and procedures, failing to schedule Plaintiff for high-volume sales shifts, disciplining Plaintiff for low sales while not accounting for his vacation days, suspending Plaintiff for low sales, failing to interview Plaintiff for a particular (but unspecified) job, failing to permit Plaintiff mandatory breaks, and terminating Plaintiff's

employment. (*Id.* ¶¶ 41–43).  The AC lists six causes of action: (1) disability discrimination under the ADA, 42 U.S.C. § 12112(a) (discrimination in hiring, advancement, or discharge); (2) disability discrimination under the ADA, 42 U.S.C. § 12112(d)(4)(A) (medical examination requirements or disability-related inquiries); (3) disability discrimination under the ADA, 42 U.S.C. § 12112(b)(5)(A) (failure to make reasonable accommodations); (4) disability discrimination under the ADA, 42 U.S.C. § 12112(b)(3)(A)–(B) (use of standards with discriminatory effects); (5) violation of the ADA, 42 U.S.C. § 12115 (failure to post ADA notices); and (6) retaliation under the ADA, 42 U.S.C. § 12203(a).  Defendants have moved for summary judgment.

## II.     LEGAL STANDARDS

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  In determining summary judgment, a court uses a burden-shifting scheme:

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations and internal quotation marks omitted).  In contrast, when the nonmoving party bears the burden

of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987). In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

## III. ANALYSIS

Defendants argue they reasonably accommodated Plaintiff's condition by providing him with alternative positions, one of which was in fact a promotion, and that they never retaliated against Plaintiff for filing the present suit but rather imposed progressive discipline against him based on his infractions just as they have done with similarly situated employees who have not filed lawsuits against Defendants.

### A. Defendants' Evidence

Defendants provide evidence Plaintiff understood that remaining awake and alert while on shift was an essential function of his position as a security officer. (Schulman Dep. 171:16–19, ECF No. 60-4). Plaintiff admitted sleeping on duty on November 23, 2009 and received a written warning; however, he argued he fell asleep because of his diabetes and that he had requested a day shift due to his diabetes in November 2008. (*See* Counseling Notice, Nov. 23, 2009, ECF No. 60-5, at 18; Employee Statement, ECF No. 60-5, at 20). When he mentioned his diabetes at a December 1, 2009 meeting about the incident, an Employee Relations representative provided Plaintiff with a form for his doctor to complete to verify his need for a day shift, and Plaintiff acknowledged receipt of the form. (*See* Acknowledgement of Receipt, ECF No. 60-6, at 2). But Plaintiff's new doctor, Dr. Ng, refused to complete the paperwork "due to being a new patient." (Schulman Email, Dec. 16, 2009, ECF No. 60-6, at 4).

On February 14, 2010, Plaintiff again fell asleep while on duty, and he again admitted it but argued it was due to his high blood sugar (439). (Employee Statement, ECF No. 60-6, at 6). In his statement, Plaintiff noted, "I [k]new that I was dozing . . . . I saw Nicohle [sic] pass by me . . . and said to myself they caught me dozing better check my sugar . . . ." (*Id.*). Because it was the second time he had been caught sleeping on duty, and because Plaintiff had provided no

medical information indicating that Plaintiff had a medical need to be on day shift, Defendants placed Plaintiff on suspension pending investigation. (*See* Counseling Notice, Feb. 14, 2010, ECF No. 60-6, at 8).  When he mentioned his diabetes at the February 17, 2010 meeting about the incident, an Employee Relations representative again provided Plaintiff with a form for his doctor to complete to verify his need for a day shift, and Plaintiff acknowledged receipt of the form. (*See* Acknowledgement of Receipt, ECF No. 60-6, at 10).  Defendants sent Plaintiff a letter on February 19, 2010 wherein Defendants recounted the infractions and the opportunities they had given him to substantiate his need for an accommodation by transfer to day shift, noting that it was his responsibility to verify his medical situation so that Defendants would excuse his infractions. (*See* Letter, Feb. 19, 2010, ECF No. 60-6, at 12).

On February 23, 2010, Dr. Ng completed Plaintiff's form, and Defendants received it. (*See* Medical Verification Form, Feb. 23, 2010, ECF No. 60-6, at 15).  Dr. Ng indicated that Plaintiff had diabetes that impaired his ability to perform manual tasks, walk, see, speak, breathe, sit, stand, and lift when blood sugar became too high or low. (*Id.* 2).  Dr. Ng noted that Plaintiff would need glucose tablets and insulin to manage his blood sugar. (*Id.*).  Dr. Ng opined that Plaintiff could perform the essential functions of his position and could work all day with a reasonable accommodation, which would be to only work day shift and to have snacks and insulin on his person at all times. (*Id.* 3).  Defendants' own doctor, Dr. Rohani reviewed Plaintiff's records and generally agreed with Dr. Ng's analysis but opined that Plaintiff should be able to work any shift so long as he had the tools to manage his blood sugar with him. (Rohani Letter, Mar. 10, 2010, ECF No. 60-7, at 2).

In light of the medical evidence, Defendants permitted Plaintiff to return to work, but in an alternative position because of fears he may fall asleep on duty again, which was an

unacceptable risk for a security guard. Defendants therefore gave Plaintiff thirty-days of leave to seek another position through an assisted job search, later extending the leave for another 30 days. (*See* Assisted Job Search Forms, ECF No. 60-7, at 4, 6)). On May 7, 2010, Defendants offered Plaintiff the position of Assistant Shift Manager for the Public Area Department, and Plaintiff accepted the position after agreeing that he could perform the job's essential functions. (*See* Offer Letter, May 7, 2010, ECF No. 60-7, at 8; Schulman Dep. 161:24–162:8). On August 13, 2010, however, Plaintiff was again seen sleeping on duty, and Defendants placed him on suspension pending investigation. (*See* Counseling Notice, Aug. 13, 2010, ECF No. 60-7, at 15). Plaintiff admitted sleeping on duty but again argued it was due to his diabetes. (*See* Public Areas Department Statement, ECF No. 60-7, at 17). Plaintiff noted in the statement that he checked his blood sugar at 2:13 a.m., and it was 57. Plaintiff did not, however, note whether he ate anything to raise his blood sugar before falling asleep at approximately 3 a.m. or whether he stood up to avoid falling asleep, notified other personnel of the situation, or took any other action to prevent an incident.

     Defendants then wrote Dr. Ng for guidance as to how to prevent future incidents. (*See* Wynn Letter, Aug. 20, 2010, ECF No. 60-7, at 19). Dr. Ng replied that Plaintiff should work on day shift and should have breaks to monitor his blood sugar, noting no impairment when blood sugar was normal, and noting that evening blood sugar levels tend to be more erratic. (*See* Medical Verification Form, Aug. 26, 2010, ECF No. 60-8, at 2). In a follow-up letter, Dr. Ng noted that day shift work was important, but that Plaintiff must still closely monitor his blood sugar, especially after eating. (Ng Letter, Aug. 30, 2010, ECF No. 60-8, at 7).

     Defendants met with Plaintiff on September 2, 2010 to discuss his employment and offered him a position as a sales associate in the San Georgio men's shoe store on day shift and

"swing" shift. (*See* Wynn Letter, Sept. 2, 2010, ECF No. 60-8, at 9; Schulman Statement, Sept. 2, 2010, ECF No. 60-8, at 11; Offer Letter, Sept. 3, 2010, ECF No. 60-8, at 13).  Plaintiff worked at San Georgio until its closure in 2012. (Schulman Dep. 183:18–24).  When San Georgio's closure was announced, Plaintiff was given the opportunity to apply to work in another retail store at Wynn, and he applied to work in a jewelry store, Tiny Baubles. (*Id.* 184:9–16, 200:10–12).

Plaintiff began working at Tiny Baubles in May 2012. (Marquez Aff. ¶ 7, ECF No. 60-9, at 2).  While working at Tiny Baubles, Plaintiff received three written warnings on September 29, November 3, and November 26, 2012, respectively, for: (1) taking more than two pieces of merchandise out of a display case at once (five) and causing a shortage of $725 by charging the wrong amount for an item as a result; (2) causing a shortage of $60 by giving incorrect change; and (3) using a personal cell phone while on the selling floor. (*See* Written Warnings, ECF No. 60-9, at 8, 10, 12).  Plaintiff admits causing the shortages, although he argued that the first shortage was at least partially the fault of another employee. (Schulman Dep. 201:11–13, 203:2–12).  Defendants have also disciplined at least six other employees for violation of the cell phone policy. (*See* Counseling Notices, ECF No. 60-9, at 14–19).

Defendants also disciplined Plaintiff for low sales at Tiny Baubles in accordance with the progressive discipline described in Retail Division Policy 5.2 (the "Policy"), which Plaintiff had been familiarized with both at San Georgio and Tiny Baubles. (*See* Policy, ECF No. 60-10, at 2; Schulman Dep. 198:5–15).  The Policy applied to commissioned sales associates and provided for a verbal warning, a first written warning, a second written warning, and suspension pending investigation. (*See* Policy).  Under the Policy, discipline is imposed whenever a commissioned

sales associate's sales volume falls below the store's average for the "last year." (*Id.*).[2] Plaintiff had the lowest sales in Tiny Baubles in October 2012, and he received a verbal warning. (*See* Verbal Warning, Nov. 3, 2012, ECF No. 60-10, at 4). He had the lowest sales again in November 2012, and he received a first written warning. (*See* Counseling Notice, Jan. 4, 2013, ECF No. 60-10, at 10). Plaintiff received a second written warning for low sales in January 2013. (*See* Counseling Notice, Feb. 27, 2013, ECF No. 60-10, at 12). In February 2013, Plaintiff was again the lowest performing sales associate in Tiny Baubles, with sales per hour of $47. According to the Policy, Plaintiff should have been suspended pending discipline, but Defendants afforded Plaintiff an extra chance and gave him a "last and final warning." (*See* Bracken Letter, Apr. 8, 2013, ECF No. 60-10, at 18). In March 2013, Plaintiff was again the lowest performing sales associate in Tiny Baubles, with sales per hour of $83. Defendant adduces spreadsheets tracking sales figures for sales associates in Tiny Baubles during the relevant time periods, which show Plaintiff's sales as the lowest of non-exempt associates and below the "last year" average for the relevant months. (*See* Wynn/Encore Retail Monthly Occupational Sale Tracker - Tiny Baubles, ECF No. 60-10, at 6, 8, 14, 16, 20). Defendants therefore suspended Plaintiff pending investigation and eventually terminated him effective April 30, 2013 for poor job performance. (*See* Counseling Notice, Apr. 25, 2013, ECF No. 60-11, at 2;

---

2 The Policy notes that calculation of sales volume is based on sales per hour, units per transaction, and average dollar sale, but it does not specify which of these measures or what combination of them is used to calculate sales volume or whether sales associates must remain above average for all three categories. Also, the average is based on "last year," but it does not specify whether this is a rolling calculation or whether it is based on the previous calendar year. The Policy also applies only to the lowest volume sales associate who does not meet the average. The spreadsheets adduced as evidence clarify that the critical figure for discipline is dollars of sales per hour worked and that the "last year" is a rolling monthly calculation of average dollars of sales per hour worked over the previous year. Finally: (1) no associate is subject to the Policy until having worked in the store for 90 days; (2) the level of discipline resets after eight months without discipline; and (3) the top 20 salespersons (presumably meaning of all Wynn/Encore stores) over the previous four months are immune from discipline. (*Id.*).

Termination, ECF No. 60-11, at 4).  Defendants adduce evidence showing that at least three other sales associates had been terminated for low sales under the Policy before Plaintiff (in March 2012, December 2012, and January, 2013). (*See* Terminations, ECF No. 60-11, at 6–8). Defendants also adduce evidence of those three employees and eleven additional employees having been progressively disciplined under the Policy as early as September 2011. (*See* Counselling Notices and Letters, ECF No. 60-12 to 60–13).  None of those employees had engaged in protected activity with respect to workplace discrimination laws. (*See* Marquez Aff. ¶ 17).

### B. Burden Shifting and Plaintiff's Evidence

#### 1. Reasonable Accommodation

The Court finds that Defendants have satisfied their initial burden on summary judgment that they did not fail to make a reasonable accommodation under § 12112(b)(5)(A) when denying Plaintiff a day shift.  Plaintiff does not allege in the FAC that Defendants refused to permit him to have blood testing supplies, insulin, and food or glucose pills with him while he was working so that he could manage his blood sugar level.  Plaintiff admits having at least blood testing supplies with him when he woke up on February 14, 2010 and noted to himself that he had to check his blood sugar because he had been caught sleeping.  Moving Plaintiff to a day shift was not the only way to reasonably accommodate Plaintiff's diabetes.  Permitting Plaintiff to manage his blood sugar with food, insulin, and testing supplies cannot be said not to have been a reasonable accommodation, which need not be the employee's preferred accommodation. *See EEOC v. UPS Supply Chain Solutions*, 620 F.3d 1103, 1110–11 (9th Cir. 2010) (quoting *Zivkovic v. S. Calif. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002)).  Indeed, even after receiving Dr. Ng's letter, Defendants did not deny Plaintiff a reasonable accommodation by not

moving him to the day shift, as Dr. Ng himself noted that Plaintiff's blood sugar management and sleepiness would be a problem during daytime hours, as well. Defendants note that Plaintiff's highest recorded blood sugar readings were in fact after he had been transferred to day shift in retail, and that he once had to leave work for the hospital when his blood sugar was almost 800. (*See* Schulman Dep. 154–56). Plaintiff testifies that he was not allowed to take breaks to check his blood sugar or to have food and water at his work station during his tenure at Tiny Baubles. (*Id.* 78–79). But Plaintiff was never disciplined for sleeping while working at Tiny Baubles, and he does not testify that these options were not permitted when he was a security guard and manager. The Court therefore grants summary judgment as to the reasonable accommodation claim.

### 2. Discrimination

As to the discrimination claim under § 12112(a), Plaintiff does not allege that he received lower pay or benefits when transferred from security to public areas management, but only that he had a lower opportunity for overtime pay. Overtime pay is a contingent benefit that an employer needn't generally offer. Strictly speaking, it is not a benefit at all but a requirement upon an employer if the employer offers and the employee accepts excess hours. Denial of overtime pay can constitute an adverse employment action where a person is denied a particular overtime opportunity for an illegal reason. *See Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847–48 (9th Cir. 2004). Transfer to a less desirable position, i.e., with a reduced opportunity for overtime generally, may constitute an adverse employment action that could support an ADA claim. And Plaintiff also alleges he earned less money in the later retail positions. But Plaintiff was not transferred due to his disability but for falling asleep on the job multiple times. Although his disability contributed to those events, there is no evidence

Defendants denied Plaintiff the reasonable accommodation of being able to monitor and control his blood sugar while on night shift, and remaining awake is a business necessity for any employee, especially a security guard.  The Court therefore grants summary judgment on the discrimination claim.

### 3. Discriminatory Effects

The claim for using standards with discriminatory effects under § 12112(b)(3)(A)–(B) fails for the same reason.  The discriminatory standard complained of is the requirement of remaining awake on duty, which Plaintiff argues has a discriminatory effect on those with diabetes because they sometimes fall asleep due to high blood sugar.  The Court grants summary judgment as to this aspect of the discrimination claim.

### 4. Retaliation

As to the retaliation claim, Defendants have shown that Plaintiff was never retaliated against for having filed his Charge of Discrimination or this subsequent lawsuit and that the discipline imposed against Plaintiff while working at Tiny Baubles—the alleged retaliation, (*see* First Am. Compl. ¶ 43)—was under an established policy that Defendants enforced against many other employees who were not disabled and who did not engage in protected activity both before and after the policy was enforced against Plaintiff.  Although he argues the Policy was applied to him selectively, and that the Policy was in fact instituted to punish him, Plaintiff has adduced no contrary evidence to create a genuine issue of material fact to that effect.  Plaintiff's testimony that the Policy was "never enforced" is both conclusory and belied by the available evidence, and his testimony that the Policy was "confusing" is irrelevant. (*See* Schulman Dep. 82:4–5). Plaintiff presents no evidence indicating that the Policy was employed against him selectively because of his disability or in retaliation for protected activity.  Plaintiff provides evidence that

he met "sales goals" set by him and his supervisor, but he does not provide any evidence that the Policy of disciplining the lowest performing sales associate, regardless of whether that associate's personal sales goals were met, was selectively applied. Plaintiff's complaint about the Policy—specifically, that it is inappropriate to discipline an employee who has met his sales goals, regardless of whether the employee is the lowest performing salesperson—essentially constitutes a labor grievance potentially applicable to any employee of Defendants. There is simply no evidence adduced of selective application of the Policy to Plaintiff, and the substantive unfairness of the Policy itself is not at issue in this case. The Court therefore grants summary judgment against the retaliation claim.

### 5. Medical Inquiries

The claim under § 12112(d)(4)(A) fails because Defendants have shown, and Plaintiff has not rebutted, that the inquiries to Plaintiff's doctors as to whether he needed to be on day shift and how to help him manage his blood sugar and stay awake were "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).

### 6. ADA Postings

Finally, the claim under § 12115 for failure to post ADA notices fails for lack of jurisdiction as it is not included in or reasonably related to the claims in the Charge of Discrimination. *See B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1099–1100 (9th Cir. 2002). Defendants have satisfied their initial burden on summary judgment as to this claim, in any case, (*see* Marquez Aff. ¶¶ 1, 19), and Plaintiff has not rebutted the testimony that Wynn has had ADA notices posted at employee entrances since at least September 2008, before Plaintiff began his employment.

///

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion for Summary Judgment (ECF No. 60) is GRANTED.

IT IS FURTHER ORDERED that the Clerk shall enter judgment and close the case.

IT IS SO ORDERED.

Dated this 15th day of January, 2016.

_____
ROBERT C. JONES
United States District Judge